UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No. <u>21-611</u> |
| INTERNATIONAL BOND & MARINE, LTD. | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

## **<u>COMPLAINT</u>**

The United States, through its undersigned attorneys, brings this civil action and alleges the following:

1.      This action is brought by the United States on behalf of the Department of Homeland Security, U.S. Customs and Border Protection (CBP), to recover unpaid Federal Excise Tax (FET), stemming from violations of 19 U.S.C. § 1592(a), with respect to entries of diamond jewelry made between May 21, 2010, and March 4, 2018.  (Attachment 1, Entry Worksheet)

2.      This Court possesses exclusive jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1582.

3.      At all relevant times, defendant, International Bond and Marine Brokerage, Ltd. (International Bond), was a New Jersey corporation with an office at 2 Hudson Place, 4th Floor, Hoboken, New Jersey 07030, and was authorized to underwrite surety bonds.

4.     At all relevant times, International Bond acted as surety for Anaya Gems, a New York corporation with a primary place of business in Long Island City, New York.  At all relevant times, Anaya Gems was owned and operated by Anshul Gandhi.

5.     At various times relevant to the complaint, International Bond, executed three Continuous Basic Import Bonds with Anaya Gems numbered: (1) 9910T2055 (coverage period April 13, 2010-March 3, 2011; coverage amount $80,000.00); (2) 991178215 (coverage period March 4, 2011-March 3, 2012; coverage amount $100,000.00); (3) 9912C0752 (coverage period March 4, 2012-March 4, 2018; coverage amount $200,000.00 per bond year).

6.     Under the terms of the bonds, International Bond agreed with Anaya Gems to jointly and severally guarantee payment of all duties, taxes, and charges, not in excess of the coverage amount per bond year, due as a result of the entry of merchandise into the United States during each yearly period covered by each bond.

### Import Entry Reporting Obligations and Payment of Customs Duties

7.     All merchandise imported into the United States is required to be "entered," unless specifically excepted.  19 C.F.R. § 141.4(a); 19 U.S.C. § 1484.  "Entry" means, among other things, the documentation or data that must be filed with an officer of CBP that allow the agency to assess the customs duties due on merchandise being imported into the United States. 19 C.F.R. § 141.0a(a).

8.     To complete an "entry," an importer must file, among other things: (i) an entry summary (CBP Form 7501) that declares the value of the merchandise and the applicable duty

rate; and (ii) a commercial invoice that provides verification of the value of the merchandise. *See, e.g.*, 19 C.F.R. §§ 141.0a, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

9.      The entity serving as the "importer of record" is responsible for paying the customs duty and using reasonable care in making and providing accurate documentation to CBP that allows the agency to assess the customs duties due on the merchandise.  *See* 19 U.S.C. § 1484; 19 U.S.C. § 1484(a)(1)(B).

10.      Generally, the importer or record is required to deposit estimated duties with CBP at the time of entry.  19 U.S.C. § 1505; 19 C.F.R. § 141.101.  In most cases, the amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

11.      The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary. Federal law provides that every importer of record must file a declaration stating that the values set forth on these documents are accurate.  19 U.S.C. § 1485.

12.      Generally, importers of record are required to declare the "transaction value" of the goods, which is the price actually paid or payable for the merchandise plus, if applicable, certain additional costs incurred with respect to the merchandise. 19 U.S.C. § 1401a(a)(1)(A), (b).

13.      The entry summary form includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices,

values, quantities . . . and are true and correct" and that the declarant "will immediately furnish to the appropriate CBP officer any information showing a different statement of facts." CBP Form 7501.

14.     Anaya Gems, like many other importers of record, used a customs broker to assist it in clearing goods for entry by preparing the entry summary and other necessary paperwork and calculating taxes and duties. The customs broker completed the entry summary based on the information, including invoices, provided by Anaya Gems, which is responsible for the accuracy of the information reported to CBP.

**Anaya Gems's Business**

15.     During all relevant periods, Anaya Gems sold jewelry to retailers in the United States.  These retailers included, among others, nationwide chains like Sterling Jewelers, Kay Jewelers, Zales Jewelers, J.C. Penney, Kmart, Sears, Walmart, Army and Navy Exchange stores, and Kohl's.  Anaya Gems also sold jewelry online through the website www.netaya.com.

16.     During the relevant periods, Anaya Gems imported merchandise from, among other places, Hong Kong and Thailand, including jewelry containing diamonds worth tens of millions of dollars.

17.     Anaya Gems imported its jewelry merchandise from various suppliers based in Hong Kong, including MJ Manjusaka Jewelers Co., Ltd. (Manjusaka) and La Vie Premium Ltd. (La Vie). Anaya Gems also imported Jewelry from manufacturers based in Thailand, including Beauty Gems Factory Co., Ltd. (Beauty Gems), Regal Jewelry Manufacture Co., Ltd. (Regal), and Gems Creations Limited (Gems Creations).

4

18.     The diamonds used in the Jewelry assembled by these manufacturers were obtained from companies that shared common ownership with Anaya Gems, including India-based companies Antrix Diamond Exports, Ltd. (Antrix), Shubh Exports, and Netaya Jewels PVT Ltd. (collectively Diamond Suppliers).  Mr. Gandhi's family members, including his father, owned, operated and/or controlled the Diamond Suppliers.  Antrix had an ownership interest in Anaya Gems.

19.     The Diamond Suppliers billed and sent invoices to Anaya Gems—as well as to DNM Jewelry Inc. and Diam Trade Corp. which did business with Anaya Gems—for the cost of the diamonds shipped to the manufacturers.  Mr. Gandhi was copied on communications transmitting these invoices, and Anaya Gems, DNM Jewelery Inc., and Diam Trade Corp. made payments to the Diamond Suppliers.

20.     Anaya Gems staff recorded the actual costs of the diamonds contained in the Jewelry in its accounting systems.

21.     The Hong Kong and Thailand manufacturers used the diamonds provided by the Diamond Suppliers to create the finished Jewelry that was exported to Anaya Gems.  The manufacturers were not billed for, and did not pay for, the diamonds that they used to assemble the finished Jewelry.

22.     Mr. Gandhi was closely involved in managing the day-to-day operations of Anaya Gems. Mr. Gandhi knew how much Anaya Gems paid for the shipments of Jewelry imported from Hong Kong and Thailand, and directed and approved the specific payments made to the

manufacturers. Mr. Gandhi also knew that Anaya Gems was invoiced for the costs of the diamonds provided by the Diamond Suppliers to the manufacturers, and that the manufacturers did not pay the Diamond Suppliers for diamonds used to assemble the finished Jewelry shipped to Anaya Gems. Mr. Gandhi regularly communicated with the manufacturers that shipped Jewelry to Anaya Gems, and he selected the merchandise items to be sent.

## Anaya's Fraudulent Import Scheme

23.     Anaya Gems engaged in a deliberate scheme to fraudulently underpay customs duties owed to the United States in connection with jewelry imported from Hong Kong and Thailand.  Anaya Gems caused false representations to be made concerning the value of the imported jewelry on entry documents filed with CBP and made, or caused to be made, invoices that did not reflect the actual value of the jewelry, which were also filed with CBP.

24.     Anaya Gems did not report the value of the diamonds, or grossly understated the value of the diamonds, contained in the jewelry it imported from Hong Kong and Thailand.  For example, during all relevant periods, Anaya Gems completely omitted the value of the diamonds contained in the jewelry it imported from Manjusaka on entry documents filed by its customs broker with CBP.  As a result, Anaya Gems fraudulently avoided paying the customs duties on the diamonds contained in the jewelry that they were obligated to pay.

25.     Through its customs broker, Anaya Gems submitted invoices from the jewelry manufacturers to support the declared values which also omitted the value of the diamonds, or grossly understated the value of the diamonds.

26.     The value of the diamonds was generally a significant portion of the value of the imported Jewelry.  Anaya Gems routinely and knowingly underpaid customs duties for the jewelry imported from Hong Kong and Thailand. The entry documents submitted by Anaya Gems for the Jewelry imported from Hong Kong and Thailand were false. Anaya Gems regularly and knowingly misrepresented the actual value of the Jewelry on entry documents filed by its customs broker with CBP by not including the value of the diamonds, or grossly understating the value of the diamonds, contained in the Jewelry.  For example, throughout all relevant periods, Anaya Gems did not include the value of the diamonds included in the Jewelry imported from MJ Manjusaka Jewelers Co., Ltd. on entry documents filed by its customs broker with CBP. As a result, Anaya Gems did not pay millions of dollars in customs duties that it was obligated to pay on the diamonds contained in the Jewelry.

27.     As president and owner of Anaya Gems, Mr. Gandhi was involved in pricing the Jewelry for purposes of selling the merchandise to retailers. When calculating the prices to sell merchandise to retailers, Mr. Gandhi and Anaya Gems staff used the actual value of the pieces-including the value of the diamonds-as opposed to the values reported to CBP.

28.     Mr. Gandhi was aware of Anaya Gems' obligation to report the accurate value of the imported Jewelry to the CBP, which included the full value of any diamonds included in the Jewelry. Mr. Gandhi knew that the invoices used by Anaya Gems' customs broker to record the value of the merchandise declared on the entry summary forms did not include the full value of the diamonds contained in the Jewelry. Mr. Gandhi was aware that Anaya Gems did not accurately report the value of Jewelry imported from Hong Kong and Thailand and that this resulted in the underpayment of customs duties that were due and owing to the United States.

7

29.     During all relevant periods, the shipments imported by Anaya Gems were covered under surety bonds held by International Bond.

30.     As a result of the violations described in paragraphs 23 through 29 above, the United States was deprived of lawful duties, taxes, and fees in the amount of $1,384,149.00.  Per the terms of their bond agreements with Anaya Gems, International Bond is responsible for $734,390.00 in unpaid duties for entries made by Anaya Gems during the relevant periods.

## COUNT I

31.     The allegations contained in paragraphs 1 through 30 above are restated and incorporated by reference.

32.     Based on Anaya Gems's violations of 19 U.S.C. § 1592(a) and International Bond's agreement to pay any duties, taxes, or fees owed upon entries of merchandise subject to Anaya Gems's continuous entry bonds, International Bond is liable to the United States for $734,390.00 in unpaid taxes, duties, and fees owed for the subject entries dated from April 13, 2010 through March 4, 2018.

## COUNT II

33.     The allegations contained in paragraphs 1 through 30 above are restated and incorporated by reference

34.     International Bond is liable for mandatory statutory interest running from the date of demand pursuant to 19 U.S.C. § 580.

## COUNT III

32.    The allegations contained in paragraphs 1 through 31 above are restated and incorporated by reference.

33.    In addition to International Bond's liability for mandatory interest under 19 U.S.C. § 580, International Bond is liable for prejudgment interest running from the date of entry, and any other interest provided by law.

WHEREFORE, the United States respectfully requests that the Court enter judgment against defendant, International Bond, for the relief requested in Counts I through III above, plus attorney fees, and such other and further relief as may be just and appropriate, including any interest provided by law.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Director

/s/ Catharine M. Parnell
CATHARINE M. PARNELL
Trial Attorney
Commercial Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 532-3467
(202) 353-0461 (fax)

OF COUNSEL
ALEXANDER L. JUDKA
U.S. Customs and Border Protection
New York, New York

Dated: December 6, 2021